UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

WILLIAM L. MCBURNIE,  :
      *Plaintiff,*  :
        :   No. 3:11-cv-06801-PGS-TJB
   vs.  :
     :
MARSH & MCLENNAN COMPANIES, INC.  :
MARSH INC., MARSH USA INC.,  :
MARSH GLOBAL BROKING INC.,  :   JURY DEMANDED
MARSH PLACEMENT INC.  :
KROLL INC.,  :
      *Defendants.*  :

## FIRST AMENDED COMPLAINT

Plaintiff William L. McBurnie ("McBurnie") by his attorneys, Haines and Associates,

files this civil complaint against Marsh & McClennan Companies, Inc., Marsh Inc., Marsh USA

Inc., Marsh Global Broking Inc., Marsh Placement Inc. and Kroll Inc. (collectively "Marsh" or

the "Marsh Defendants") and alleges as follows:

## THE NATURE OF THE ACTION

1.     This is a civil action for damages and remedies brought pursuant to 42 U.S.C. §

1983 for malicious prosecution in violation of plaintiff's Fourth and Fourteenth Amendment

rights; breach of contract; breach of the implied covenant of good faith and fair dealing; unjust

enrichment; *quantum meruit*; and tortious interference with contract and prospective contract.

2.     This suit arises from the conduct of Marsh in wrongfully and maliciously

inducing and/or persuading the New York Attorney General's office, then led by disgraced

former Attorney General Elliot Spitzer, to investigate, prosecute and indict Mr. McBurnie.  After

over four years, the meritless and unfounded charges against Mr. McBurnie were dismissed in

his favor but not before Mr. McBurnie suffered serious consequences at the hands of the Marsh

Defendants who (a) terminated Mr. McBurnie's employment; (b) rendered Mr. McBurnie

unemployable in the insurance industry due to the baseless indictment; (c) subjected Mr.

McBurnie to damage to his reputation; (d) failed to timely pay Mr. McBurnie's defense costs; (e)

denied Mr. McBurnie access to insurance policies brokered by Marsh and under which

McBurnie is an insured who sought to file an insurance claim for advancement of fees and

indemnification of legal expenses; (f) forced Mr. McBurnie to virtually empty his lifetime

savings, including requiring early withdrawal of his retirement funds; and (g) forced Mr.

McBurnie to incur debts totaling hundreds of thousands of dollars, which debts continue today,

and to pay interest charges thereon.

      3.      Plaintiff seeks damages in excess of $150,000, including but not limited to,

compensatory damages, punitive damages, and reasonable attorney's fees pursuant to 42 U.S.C.

§ 1988 severally and/or jointly against all named parties and/or any other relief the Court deems

appropriate.

## JURISDICTION AND VENUE

      4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331; 29 U.S.C. § 1132(a); and principles of supplemental jurisdiction pursuant to 28 U.S.C.

§ 1367.

      5.      This Court has personal jurisdiction over Defendants pursuant to Federal Rule of

Civil Procedure 4(k).

      6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## THE PARTIES

7.      Plaintiff William L. McBurnie is an individual and resident of New Jersey.  Mr. McBurnie was an employee of Marsh from April of 1997 until February 8, 2005.

8.      Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business in New York, New York.

9.      Defendant Marsh Inc. is a Delaware Corporation with its principal place of business in New York, New York.

10.     Defendant Marsh USA Inc. is a Delaware corporation with its principal place of business in New York, New York.

11.     Defendant Marsh Global Broking Inc. is an Illinois corporation with its principal place of business in New York, New York.

12.     Defendant Marsh Placement Inc. is an Illinois corporation with its principal place of business in New York, New York.

13.     Defendant Kroll Inc. is a Delaware corporation with its principal place of business in New York, New York.  At all relevant times, although not presently, Kroll Inc. was a subsidiary of Marsh.

14.     Defendants were at all times acting under color of state law pursuant to 42 U.S.C. § 1983.

## THE FACTS

### I.      THE NEW YORK ATTORNEY GENERAL COMMENCES AN INVESTIGATION INTO MARSH'S CONTINGENT COMMISSIONS PRACTICES

15.     In April 2004, Defendant Marsh & McLennan Companies, Inc. received a subpoena from the New York Attorney General ("NYAG").  The subpoena called for Marsh to produce numerous documents related to Marsh's contingent commission practices.

16.     In Approximately May 2004, Spitzer, informed the public that he had initiated the investigation into Marsh's use of contingent commissions. The New York Attorney General alleged that these activities were illegal because he believed they unlawfully suppressed competition and resulted in bid-rigging.

17.     Marsh received additional subpoenas on August 10, 2004 and September 17, 2004, also calling for documents related to Marsh's contingent commissions practices and Marsh's process of requesting quotes from insurance companies for potential coverage of its customers. Marsh produced over 130,000 pages in response to the subpoenas.

18.     On October 14, 2004, Spitzer publicly announced he was filing a civil complaint against Marsh & McLennan Companies, Inc. and Marsh, Inc. in connection with the use of contingent commissions and other business practices (the "Marsh Complaint"). A copy of the announcement is attached as Exhibit A.   The Marsh Complaint alleged causes of action against Marsh for purportedly fraudulent business practices, antitrust violations, securities fraud, unjust enrichment, and common law fraud. A copy of the Marsh Complaint is attached as Exhibit B.

19.     The New York Attorney General's investigation into Marsh was broad. By way of example, the investigation included the excess casualty insurance, healthcare, and middle market lines of Marsh's Global Broking Unit. Upon information and belief, it also included subpoenas directed to at least twenty-five records custodians identified in the correspondence between the New York Attorney General and Marsh.

### A.     Contingent Commissions

#### 1.     Contingent Commissions Have Been Used In The Insurance Industry For Decades

20.     Contingent commissions are fees paid by insurers to insurance brokers who place insurance business with the insurer.  They are typically paid in addition to the regular

commissions that insurance brokers charge the insurer when the broker matches the insurer with a corporation that needs insurance coverage.

21.     The practice of charging contingent commissions is widely accepted and has been around for decades.

22.     In April 2004, the Risk and Insurance Management Society, the trade association representing the interests of commercial customers, examined contingent commission arrangements and concluded that they are "endemic to the manufacturer/distributor relationship, and there is nothing inherently wrong with them."  Roger Wade, *A Brief History of Contingent Commission Agreements*, INSURANCE JOURNAL, Feb.7, 2005.  A copy of this article is attached as Exhibit C.

23.     As of the beginning 2005, contingent commissions among the 100 biggest insurance brokers operating in the United States averaged approximately 7 percent of annual gross revenues earned by these brokers, and in some cases comprised as much as 12 percent of annual gross revenues.  *Id.*

24.     According to the New York Times, by one analyst's estimate, "contingent commissions…can total more than 30 percent of a broker's net income."  Gretchen Morgenson, *Hat Trick: A 3rd Unit Of Marsh Under Fire*, N.Y. Times, May 2, 2004.  A copy of this article is attached as Exhibit D.

### 2.     Marsh Has Always Approved the Use of Contingent Commissions

25.     The Marsh Defendants are engaged in the business of brokering insurance. Consistent with industry practice, Marsh has earned contingent commissions from insurers for several decades.  Around the time the New York Attorney General began its investigation, Marsh was "among the largest recipients of these fees in the country, if not the largest." Gretchen

Morgenson, *Hat Trick: A 3rd Unit Of Marsh Filed Under Fire*, N.Y. TIMES, May 2, 2004. *Id.* According to the New York Times, "Dowling & Partners, a research firm in Farmington, Conn., specializing in insurance companies, has estimated how much of Marsh's revenue [came] from contingency fees. The firm said that last year, Marsh's contingency fee revenues could have totaled $700 million; after taxes, the fees could have generated $450 million, or 30 percent of the insurance unit's earnings." *Id.*

26.     In late April 2004, when the New York Attorney General began investigating contingent commissions, Jeffrey W. Greenberg, then the chairman and chief executive officer ("CEO") of Marsh, sent a memorandum to his staff defending contingent commission agreements, calling them a "long-standing, common industry practice." *Id.*

27.     Despite the NYAG's aggressive attack on contingent commissions, contingent commissions continue to be used today.  In February 2010, the attorneys general of New York, Illinois and Connecticut and the insurance departments of New York and Illinois agreed to terms that specifically allowed Marsh, as well as insurance brokers Aon Corp. and Willis Group Holdings, to collect contingent commissions, in return for greater transparency on agent and broker compensation.

### B.     **Bid Rigging**

28.     During the course of the NYAG's investigation of contingent commissions, it came to the NYAG's attention that certain employees in Marsh Global Broking, Inc.'s Excess Casualty Department ("Marsh GB Excess Casualty") had made a practice of soliciting  insurance quotes  that were intended to be losing bids, irrespective of whether the particular insurer involved in the quote was willing to offer a more competitive bid, and in some cases, without

regard to whether the insurer would be willing to "bind" coverage if the insurer were actually asked to do so.

29.     In many instances, certain Marsh GB Excess Casualty employees labeled the aforementioned bidding practices and quotations "B bids," "B quotes," or other terms in an apparent attempt to formalize, streamline or otherwise facilitate such practices. The meaning actually ascribed to such terms varied between employees within the department.

30.     The NYAG took the position that the aforementioned solicitation practices were fraudulent and illegal, and were intended by Marsh to further its contingent commissions revenue objective by protecting "favored" insurers from competition in exchange for lucrative contingent commissions payments. In addition, the NYAG apparently believed the brokers themselves were rewarded through raises and bonuses for engaging in bid rigging.

31.     Although repeatedly asked by colleagues to approach insurers for illegitimate bids, Mr. McBurnie did not engage in such a practice.

32.     When asked to procure such illegitimate bids, Mr. McBurnie instead sought legitimate bids or, if the circumstances warranted, refused to approach the insurer for a bid on the illegitimate basis requested. Marsh knew or should have known this.

33.     Moroever, in meetings with Mr. McBurnie's superiors, Mr. McBurnie complained about such bidding practices, going as far as to state to his superiors on several occasions that the manner in which Marsh GB Excess Casualty did business "could be construed as fraud." On one such occasion, in response to Mr. McBurnie's statement that Marsh GB Excess Casualty's business practices "could be construed as fraud," his department manager replied simply: "The first thing they said to me when I got here was: 'Don't f--- with the money.' "

34.     In May 2003, fed up with what Mr. McBurnie perceived to be improper business practices within Marsh GB Excess Casualty, and frustrated with the refusal of Marsh's management to address and correct those improper practices, Mr. McBurnie informed his supervisor that he did not wish to continue in his transaction-focused role within the department. Effective July 1, 2003, Mr. McBurnie assumed his new "coverage only" role, a position he held until his departure from the company in February 2005.

35.     All of Mr. McBurnie's activities had been legitimate, approved by Marsh's legal department and for the benefit of Marsh and its clients.  Marsh was aware of those facts and was aware that he had committed no crime, yet Marsh still knowingly targeted him for prosecution by the NYAG for engaging in such practices.

## II.     TO AVOID CRIMINAL PROSECUTION, MARSH AND ITS CEO, MICHAEL CHERKASKY, COLLUDED WITH AND CONVINCED THE NEW YORK ATTORNEY GENERAL TO MAKE SCAPEGOATS OF, AND TO CRIMINALLY PROSECUTE DESIGNATED EMPLOYEES

36.     Criminal prosecution of any one of the Marsh Defendants would have devastated Marsh and put Marsh's very survival at risk.  From the outset of the investigation, Marsh was determined at all costs to avoid and/or contain the scope of prosecutions and damage including but not limited to making it appear as if any wrongful conduct was committed by a limited number of rogue employees.

37.     Upon information and belief, within days of the October 14, 2004 announcement of the civil suit against Marsh, Marsh met with Spitzer.  At this meeting, Spitzer indicated that he would not discuss settling the matter with Marsh so long as Mr. Greenberg was part of Marsh's management.  Instead, Spitzer indicated he would discuss the matter with Michael Cherkasky

who, at the time, was transitioning from CEO of Kroll Inc. to Marsh Inc., both subsidiaries of Marsh.[1]

38.     Mr. Cherkasky and Spitzer, not coincidentally, are close friends.  As the New York Times reported, "Mr. Spitzer and Mr. Cherkasky have been friends since they worked together years ago [in the 1990's] in the Manhattan district attorney's office, when Mr. Cherkasky was Mr. Spitzer's boss."  Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 Million*, N.Y. TIMES February 1, 2005.  A copy of this article is attached as Exhibit E.  In addition, Mr. Cherkasky was a political supporter of Spitzer and had contributed to Spitzer's campaigns.

39.     In order to ingratiate itself to Spitzer, Marsh went so far as to replace Mr. Greenberg with Spitzer's old friend, Mr. Cherkasky.  On October 25, 2004, at an emergency meeting of Marsh's Board of Directors, the Board appointed Mr. Cherkasky as Mr. Greenberg's replacement.  As Marsh's new CEO, Mr. Cherkasky received a three year compensation package worth as much as $9,000,000.00 per year along with $7,000,000.00 in stock.[2]

40.     Spitzer himself characterized the hiring of Mr. Cherkasky an important step towards a settlement of the charges against Marsh.  Interestingly, now that Greenberg was out and Cherkasky was in, Spitzer publicly stated that the Attorney General's Office no longer saw a need to prosecute Marsh but instead was shifting its attention to select individual Marsh employees.  Press Release, New York Attorney General, Statement by Attorney General Elliot

---

[1] MMC acquired Kroll Inc., and investigative entity, in July 2004.
[2] Under Mr. Cherkasky's employment agreement with Marsh (the "Cherkasky Agreement"), for his work as CEO, "Mr. Cherkasky [wa]s entitled to an annual base salary of at least $1,000,000 (retroactive to October 14, 2004), and [wa]s eligible for an annual bonus opportunity with a range of 150% to 330% of annual base salary (minimum $2.5 million for 2005).  Mr. Cherkasky...participate[d] in M[arsh]'s long-term incentive compensation plans, received a mix of long-term equity incentive compensation awards with a combined annual target value of $5 million.  The [Cherkasky] Agreement provide[d] for a retention award comprised of 3-year restricted stock with a grant-date value of $3.75 million. . . ."  A copy of the Marsh Form 8-K, dated July 25, 2005 is attached as Exhibit F.

Spitzer Regarding the Marsh & McLennan Companies (Oct. 25, 2004).  A copy of this Press Release is attached as Exhibit G.

41.     Once in charge of Marsh, Mr. Cherkasky persuaded and/or directed the New York Attorney General, as described below, to limit the prosecution to certain individuals Marsh wanted to scapegoat in order to contain the prosecutions.

42.     Marsh's instigation, cooperation and collusion with the New York Attorney General's investigation included: 1) financing and conducting most of the investigation internally, then disclosing the results of their investigation, including privileged materials to  the New York Attorney General's office; 2) helping to identify and select the targets of the undercover investigation; and 3) examining files and records in a conclusory, premeditated fashion in order to provide inculpatory evidence.

43.     By way of example, Marsh designated certain individuals (other than Mr. McBurnie) as safe from prosecution by the New York Attorney General.  In this manner, Marsh was able to deflect publicity from itself, protect certain senior Marsh executives, including but not limited to Chris Treanor, and Roger Egan, and proclaim that the misconduct alleged by the New York Attorney General was limited to, and the work of, a few "bad actors."

44.     Marsh's active selection of targets for the Attorney General's Office was later verified by Marsh's in-house counsel who commented to Mr. McBurnie that Marsh was pleased because it had worked very hard to influence the indictment process and had achieved its goal of containing the case within the Excess Casualty Department, thereby preventing it from reaching "to Chris Treanor and the other lines of business."

45.     In addition, Marsh used its own employees to conduct "client-driven file reviews" in response to inquiries from clients.  This was primarily done by Marsh brokers, who were

directed by Marsh to flag certain files as "exceptions" if something appeared potentially problematic. The results of these reviews were provided to two senior Marsh employees who then turned the "exceptions" over to Kroll, Marsh's newly acquired investigative branch.

46.      Upon information and belief, Marsh's new subsidiary, Kroll, would pass the "exceptions" to the NYAG in order to guide its investigation.

47.      In addition, upon information and belief, Marsh produced to the NYAG the interview memoranda its counsel had prepared while interviewing its employees, including Mr. McBurnie.

48.      Thus, as part of its collusion with the NYAG, and to avoid criminal prosecution, Marsh went so far as to waive the attorney-client and work-product privileges with respect to its internal investigation.

49.      On January 25, 2005, Mr. McBurnie voluntarily submitted to an interview with the NYAG, which lasted approximately 3½ hours. During the course of this interview, Mr. McBurnie fully cooperated and explained, among other things, that he had not solicited losing bids or engaged in any criminal activity.

### III.    MARSH SIMULTANEOUSLY BEGAN ITS OWN INTERNAL INVESTIGATION AND MEDIA CAMPAIGN TO DIRECT ANY BLAME TO INDIVIDUAL EMPLOYEES

50.      Shortly after the institution of the NYAG complaint against Marsh, Marsh began its own internal investigation of its business practices. As discussed above, this included "client-driven file reviews" and employee interviews.

51.      In December of 2004, Marsh requested an interview with Mr. McBurnie as part of their internal investigation being conducted by Marsh's investigation subsidiary, Kroll and Marsh's outside counsel, Davis Polk. Mr. McBurnie voluntarily submitted to an interview that

lasted approximately two hours.  During the course of this interview, Mr. McBurnie fully

cooperated and explained, among other things, that he had not solicited losing bids or engaged in

any criminal conduct.

52.     At the same time that Marsh was taking steps to save itself by offering up

designated employees as "scapegoats" for criminal prosecution, Marsh began a public campaign

in the media to portray certain employees as "bad actors" who were not representative of the rest

of the Company.  In an interview with Bloomberg the day after becoming CEO, Mr. Cherkasky

stated that "bid-rigging appears to have been confined to William Gilman, a managing director at

Marsh Global Broking, and his group. Gilman and three of his subordinates have been suspended

along with one other employee, he said, declining to identify them."  David Plumb & Helen

Stock, *Marsh's New Chief Forms Compliance Unit; Shares Rise (Update12)*, BLOOMBERG,

October 26, 2004.  A copy of this article is attached as Exhibit H.  While Mr. McBurnie was not

specifically identified, he was part of the Marsh Global Broking group.

53.     Similarly, on November 5, 2004, the New York Times published an article

reporting that "Darren Dopp, a spokesman for Mr. Spitzer, said that Michael G. Cherkasky, the

new chief executive at Marsh, told the Attorney General that they were planning to dismiss some

employees as a part of their efforts to correct abuses outlined in Mr. Spitzer's lawsuit against

Marsh."  Joseph B. Treaster, *Ace Dismisses 2 Executives in Response to Inquiry*, N.Y. TIMES,

Nov. 5, 2004.  A copy of this article is attached as Exhibit I.

54.     These statements by Marsh and Mr. Cherkasky underscore the willingness of

Marsh to issue misstatements of facts in order to curry favor with the New York Attorney

General and to discredit its own employees with the intent of avoiding criminal prosecution for

Marsh itself.

IV.   **MARSH SETTLES THE CIVIL SUIT WITH NYAG AND AGREES TO
      TURN OVER EMPLOYEES FOR CRIMINAL PROSECUTION IN
      EXCHANGE FOR MARSH NOT BEING CRIMINALLY PROSECUTED**

55.   On January 30, 2005, just days after Mr. McBurnie's interview with the NYAG,

and about two months after waiving its attorney-client and work-product privileges, Marsh and

the NYAG entered into an agreement to resolve the Marsh Complaint (the "Settlement

Agreement"). A copy of the Settlement Agreement is attached as Exhibit J. The Settlement

Agreement required Marsh to pay $850 million into a fund over a period of four years in four

annual payments, which would then be disbursed to Marsh's policyholder clients. Under the

Settlement Agreement, Marsh also agreed to implement certain changes to its business practices

and to further "fully and promptly cooperate with the Attorney General with regard to his

Investigation, and related proceedings and actions, of any other person, corporate and entity,

including but not limited to Marsh's current and former employees, concerning the insurance

industry." See Exhibit J at p.11. Upon information and belief, this "cooperation" in fact,

consisted of Marsh and the NYAG identifying and prosecuting Mr. McBurnie falsely and

without a legitimate basis.

56.   Furthermore, as part of the Settlement Agreement, Marsh was required to publicly

distance itself from the very business practices that it had endorsed for so long, and to publicly

denounce its employees for having engaged in those business practices. In an exhibit to the

Settlement Agreement, Marsh issued the following written statement of apology:

> Marsh Inc. would like to take this opportunity to apologize for the
> conduct that led to the actions filed by the New York Attorney General
> and superintendent of insurance. The recent admissions by former
> employees of Marsh and other companies have made clear that certain
> Marsh employees unlawfully deceived their customers. Such conduct
> was shameful, at odds with Marsh's stated policies and contrary to the
> values of Marsh's tens of thousands of other employees.

In response, we have taken prompt, corrective action and implemented a series of business and corporate governance reforms. The employees of Marsh, Inc. ask our clients and others to allow us the opportunity to regain their trust.

Exhibit J at p.16.

57.     As the New York Times reported at the time of the announcement of the settlement, "Mr. Spitzer said that a written apology was included in the [Settlement] [A]greement, *noting that 'certain Marsh employees unlawfully deceived their customers' had been a precondition for a settlement.'*" See Exhibit E, Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 Million*, N.Y. TIMES February 1, 2005 (emphasis added).

58.     In a press release issued concurrently with the announcement of the settlement with the New York Attorney General, Mr. Cherkasky further stated: "We deeply regret that certain of our people failed to live up to our history of dedicated client service. The acts of these employees were inconsistent with the integrity and ethics on which this company was founded…." Press Release, Marsh & McLennan Companies, MMC Reaches Settlement Agreement with New York State Attorney General and Superintendent of New York State Insurance Department. (Jan. 31, 2005).

59.     A number of commentators even called into question how Marsh could possibly distance itself from some of the conduct that was alleged in the Marsh Complaint. For example, the New York Times quoted Mark Geistfeld, a New York University professor who taught insurance law, as follows: "The company's argument would be weakened by the fact that *the misconduct benefited Marsh and not the individual employees.*" See Exhibit E, Joseph B. Treaster, *Insurance Broker Settles Spitzer Suit for $850 million,* N.Y. TIMES, February 1, 2005 (emphasis added).

14

60.     At the time of these events, the New York Attorney General, Spitzer, was seeking the 2006 Democratic gubernatorial nomination.  Spitzer was willing to agree to forego prosecution of Marsh in return for achieving his dual goals of (1) securing a large public civil settlement with Marsh, which Spitzer could then trumpet in the press; and (2) criminally prosecuting selected individuals to further bolster his crime fighting credentials, even though the evidence did not justify such prosecutions, at least with respect to Mr. McBurnie.  Marsh and Cherkasky agreed to provide the New York Attorney General with further assistance in achieving this objective.

61.     Because Spitzer had used the negotiation of the Marsh settlement as an opportunity to install his close friend, Mr. Cherkasky, as the CEO, not only did this allow the New York Attorney General to financially reward Mr. Cherkasky, but it also guaranteed Marsh's continued collusion with and assistance to the NYAG during selection and prosecution of the target employees.

**V.     UNTIL HIS TERMINATION BY MARSH, MR. MCBURNIE WAS A LONG-TIME AND EXEMPLARY EMPLOYEE**

62.     Mr. McBurnie has worked in the insurance industry for nearly 30 years.  He started working for Johnson & Higgins ("J&H") in 1977.  J&H was acquired by Marsh & McLennan Companies in April 1997 and was merged into MMC's insurance brokerage subsidiary, Marsh Inc.  Approximately 6 months later, Mr. McBurnie transferred to the Excess Casualty Department of Marsh's centralized insurance placement unit, Marsh Global Broking.

63.     Mr. McBurnie was a productive and effective employee for Marsh.  At all relevant times, he worked out of Defendants' New York, New York offices.  At the time MMC acquired J&H, Mr. McBurnie was a Senior Vice President, a title he retained throughout his remaining employment with Marsh.

64.     Mr. McBurnie consistently received raises and bonuses while employed by Marsh.

65.     On February 8, 2005, Mr. McBurnie received a call from a Marsh human resources representative, Susan Reed, who advised him he was being "terminated for misconduct" effective at the end of the business day.

66.     On February 9, 2005, Mr. Reed telephoned Mr. McBurnie and advised him that the "termination for misconduct was a mistake" and that he was being terminated as part of a reduction in force.

67.     After his termination, Mr. McBurnie sought new employment.  He was in the process of securing a position with Integro when he was indicted and all discussions with Integro ceased.

**VI.     WITH THE FINANCIAL ASSISTANCE OF MARSH, AS WELL AS THE IDENTIFICATION OF WHOM TO TARGET, THE NEW YORK ATTORNEY GENERAL COMMENCES THE WRONGFUL PROSECUTION OF MR. MCBURNIE**

68.     From March through July 2005, the grand jury heard testimony from Marsh and the NYAG.

69.     Throughout the spring and summer of 2005, the NYAG continued to pressure Marsh employees to plead guilty to lesser offenses.

70.     When all was said and done, more than 20 insurance industry employees, more than half of which were from Marsh, pled guilty to various offenses, many of whom served as cooperating or fully immunized witnesses for the NYAG.

71.     Despite all the guilty pleas, the NYAG continued to press current Marsh employees to plead guilty.  Upon information and belief, in the summer of 2005, at least some of those employees appealed to senior management for relief.  Upon information and belief, Marsh

approached Spitzer with a list of several employees and asked Spitzer to cease pressuring these employees to plead guilty. The NYAG agreed with respect to some of those employees, but only in exchange for Marsh offering up other employees the NYAG could prosecute.

72.     Given the pressure from the NYAG to provide more individuals for prosecution, Marsh offered up and targeted Mr. McBurnie. But, Mr. McBurnie did not commit any of the crimes of which he was accused. Furthermore, Marsh knew or should have known that Mr. McBurnie had not committed any crime. Despite this knowledge, Marsh colluded with the NYAG in its investigation and convinced the NYAG to focus on and ultimately prosecute Mr. McBurnie.

73.     On September 15, 2005, the New York Attorney General's office announced an indictment against Mr. McBurnie and eight other individuals. Two of those individuals pled guilty and the other 7, including Mr. McBurnie, insisted that they were innocent.

74.     In connection with his employment with Marsh, the indictment charged Mr. McBurnie with seven counts: one count of Scheme to Defraud in the First Degree, N.Y. Penal Law § 190.65(1)(b); one count of violation of the Donnelly Act, General Business Law §§ 340 and 341; and five counts of Grand Larceny in the Second Degree, N.Y. Penal Law § 155.40(1) (the "McBurnie Indictment").

75.     As described above, from the outset, the prosecution of Mr. McBurnie was commenced in bad faith and prompted by Marsh falsely targeting Mr. McBurnie. The Marsh Complaint discussed extensively the reliance on contingent commissions by the Global Broking Middle Market division of Marsh ("Middle Market"). Mr. McBurnie was not, however, employed by the Middle Market division and no one from the Middle Market was prosecuted by the New York Attorney General.

76.     Moreover, despite the fact that the grand jury heard testimony for over thirty days, the testimony regarding Mr. McBurnie was almost non-existent and did not provide probable cause for his indictment.  Marsh provided at least eleven witnesses for the grand jury presentment.  Some of the witnesses were cooperating witnesses promised leniency by the NYAG if their testimony was deemed helpful to the NYAG's case.  At least some of these witnesses received full immunity from prosecution in exchange for their testimony.  Notably, none of the grand jury witnesses provided by Marsh attempted to refute the New York Attorney General's theory of the case or otherwise explain that McBurnie had not committed a crime.

77.     In addition, Karen Radke, a former AIG employee, testified pursuant to a cooperation agreement with the New York Attorney General.  Ms. Radke was the first and one of the key witnesses in the grand jury proceedings.  Ms. Radke, however has since recanted substantial portions of her testimony, admitted that she could not recall conversations that she testified to, and otherwise contradicted her testimony.

78.     The New York Attorney General, thus, obtained the McBurnie Indictment through false testimony and by withholding exculpatory evidence.

79.     The McBurnie Indictment was issued without probable cause.

**VII.    THE PROSECUTIONS BY MARSH AND THE NYAG FAILED**

80.     Two trials took place, with very limited success for Marsh and the NYAG.

81.     The first bench trial, of William Gilman and Edward McNenney, lasted from April 2007 to February 2008 and resulted in each defendant being convicted of a single count of Restraint of Trade & Competition, while they were acquitted of the extensive remaining charges.[3]  The defendants were sentenced to four months of weekends in jail, sentence suspended pending appeal.  However, on July 2, 2010, based on evidence not disclosed by the prosecutor,

---

[3] In addition, thirteen counts of Grand Larceny against these defendants had been dismissed prior to trial.

the trial judge vacated his own conviction finding "*the newly discovered contradictory evidence,*

*undermines the Court's confidence in the verdict.*"  *People of the state of New York v. Gilman,*

Case No.: 4800-2009, 28 Misc.3d 1217(A), 2010 N.Y. Slip Op. 51379(U), 2010 N.Y. Misc.

Lexis 3633, at *21 (N.Y. Cty. Sup. Ct. July 2, 2010)(emphasis added).  A copy of this decision is

attached as Exhibit K.

82.  The Court determined that the New York Attorney General's office committed

serious misconduct in the prosecution of Messrs. Gilman and McNenney.  The prosecutors failed

to disclose:

> (1) approximately 700,000 pages of documents…which allegedly, belie
> the People's theory of the case and the testimony of two key witnesses for
> the prosecution, (2) prior testimony at four depositions by three
> cooperating witnesses in related proceedings, (3) prior deposition
> testimony in a related proceeding, of which the People were aware, by a
> non-testifying witness which is allegedly exculpatory, (4) testimony given
> by two cooperators in related proceedings given while the criminal trial
> was underway,… (5) a prior conviction, known to the People, for driving
> while impaired by a witness whose sobriety was at issue in the trial of
> Gilman and McNenny and [6] alleged hidden promises of leniency for
> cooperat[ing witnesses] beyond those contained in their written
> cooperation agreements.

*Id.* at *3-4.

83.  The Court also noted that "the verdict here rested firmly upon the testimony of

Spiegel, Jacobson, Tateossian, Hatton, Mohs and Murphy, and yet, each one of them, after

testifying with favorable cooperation agreements, has, at times before, during or shortly after

trial, given sworn testimony discrediting, even contradicting, their trial testimony." *Id.* at *21.

Another one of the witnesses the Court referred to was Karen Radke who had, in fact, given

additional testimony in another proceeding not involving the New York Attorney General, that

was diametrically opposed to her trial and grand jury testimony.  Similarly, the Court found that

another key witnesses, Jean-Baptiste Tateossian's, "undisclosed testimony contradicts his trial

testimony and the People's trial theories." *Id.* at *11[4] Thus, taken as a whole, the evidence

raises "not on only a **possibility, but a probability** that its disclosure would have produced a

different result." *Id.* at *21 (emphasis added).

84.     The Court also stated that, "[c]orporations which settled their civil cases and

avoided criminal charges entered into cooperation agreements with [the New York Attorney

General], *facilitating* [the New York Attorney General's] access to materials." *Id.* at *6

(emphasis added). "Thus, [the New York Attorney General] made certain that it had free access

to information from Marsh and the carriers, but controlled defense access to the same materials."

*Id.*

85.     The second trial, of Joseph Peiser, Kathleen Drake and Greg Doherty, ran from

December 2008 through October 2009 and resulted in the acquittal of all defendants on all

charges.

86.     On November 13, 2009, the New York Attorney General's office, no longer led

by Spitzer, moved to dismiss the indictment and prosecution of Mr. McBurnie.

87.     On November 19, 2009, the New York Supreme Court dismissed all criminal

charges brought against Mr. McBurnie in his favor.

88.     On March 8, 2010, the New York Supreme Court issued a Certificate of

Disposition Dismissal in favor of Mr. McBurnie.

### VIII.   DURING AND AFTER THE PROSECTUION OF MR. MCBURNIE, DEFENDANTS FAILED TO ADEQUATELY AND TIMELY COVER HIS DEFENSE COSTS AS REQUIRED

89.     According to Article IX of the Marsh By-Laws, as well as the Undertaking for

Advancement of Expenses Mr. McBurnie was required to sign in October 2004, Marsh was

---

[4] In January 2010, the Court granted a request that the charges against Ms. Radke and Mr. Tatcossian be adjourned in contemplation of dismissal.  The charges were subsequently dismissed.

required to advance "expenses (including attorneys' fees and disbursements)" incurred by Mr.

McBurnie, as an officer of Marsh, in connection with his involvement in any action, suit or

proceeding, whether civil, criminal, administrative or investigative "to the fullest extent

permitted by Delaware law." This provision was a contractual term of Mr. McBurnie's

employment and was breached by Marsh.

90.    Marsh failed to fully advance such funds, and what they did forward was not done

in a timely manner, causing Mr. McBurnie's defense to suffer and be prolonged, and for Mr.

McBurnie to incur and be forced to incur debt with interest to front some of the costs.

91.    In addition, Marsh was the broker for and the named insured corporation of the

D&O policies that were in place to cover expenses such as those incurred by Mr. McBurnie as

part of his defense.

92.    On several occasions, Mr. McBurnie, as an insured under the D&O policies,

requested copies of and information relating to the D&O policies.

93.    Marsh repeatedly refused to provide copies of and information regarding the

D&O policies to Mr. McBurnie, despite his repeated requests.

94.    Marsh, as Mr. McBurnie's employer, the insured corporation on the D&O

policies, and the broker for the Marsh D&O policies, breached its contract with Mr. McBurnie.

95.    Marsh's failure to timely pay Mr. McBurnie's defense fees and costs was done in

bad faith.

96.    As a direct and proximate result of the aforementioned conduct, Mr. McBurnie

has sustained substantial damages.

## COUNT I
### (Against all Defendants)
### (42 U.S.C. §1983 and MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS)

97. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 96 above as if specifically set forth herein.

98. At all relevant times, the Marsh Defendants were acting under color of state law.

99. Marsh instituted the criminal prosecution of Mr. McBurnie by maliciously targeting Mr. McBurnie for prosecution by the NYAG without probable cause.

100. Marsh's instigation, cooperation and collusion with the New York Attorney General's investigation included, *inter alia,* 1) financing and conducting most of the investigation internally, then disclosing the results of their investigation, including privileged materials, to the New York Attorney General's office; 2) helping to identify and select the targets of the undercover investigation; and 3) examining files and records in a conclusory, premeditated fashion in order to provide inculpatory evidence.

101. Marsh acted with malice because Marsh knew, or reasonably should have known, that Mr. McBurnie had not committed a crime.

102. The NYAG would not have sought the indictment of Mr. McBurnie without being convinced and persuaded to do so by Marsh, who was trying to protect itself and designated senior employees from criminal prosecution.

103. The testimony and documents provided to the grand jury were insufficient for a finding of probable cause to indict Mr. McBurnie.

104. Some of the testimony provided to the grand jury was later recanted.

105. The prosecution and indictment have been dismissed in Mr. McBurnie's favor.

106.   Marsh at all relevant times knew or should have known that the charges lacked merit or recklessly disregarded the truth for their own gain.

107.   Marsh colluded with and convinced the New York Attorney General, for improper motives and without a good faith basis, to prosecute Mr. McBurnie.  Among other reasons, Defendants improperly sought to avoid criminal prosecution against themselves, to create public scapegoats for the New York Attorney General's allegations, to protect certain senior employees, including but not limited to Chris Treanor and Roger Egan, and by means of all of the foregoing, to improve Marsh's position in the civil litigations related to the business practices that were the subject of the NYAG's investigation of Marsh.  Further, Mr. Cherkasky sought to gain, and did gain, a large economic benefit by becoming CEO of Marsh and receiving a lucrative employment contract through collusion with Spitzer.

108.   Due to malicious prosecution by the Marsh Defendants, Mr. McBurnie suffered damages including lost compensation, substantial penalties and fees for early withdrawals from his retirement plan, interest costs on hundreds of thousands of dollars of debt he incurred to support himself and his family during his long period of unemployment, emotional distress, damage to his reputation, and loss of time and severe inconvenience in defending the McBurnie Indictment.  In addition, Defendants are liable for punitive damages due to Defendants' egregious and intentional conduct.

109.   Marsh's actions and the subsequent legal proceedings caused Mr. McBurnie to suffer deprivation of his liberty interest, amounting to a seizure, in violation of the Fourth and Fourteenth Amendments.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages

together with lawful interests, costs, attorneys fees, damages pursuant to 42 U.S.C. § 1988 and

any other relief the Court deems just an appropriate.

## COUNT II
(Against all Defendants)
(MALICIOUS PROSECUTION UNDER NEW JERSEY LAW)

110.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through

109 above as if specifically set forth herein.

111.    Marsh initiated the criminal prosecution of Mr. McBurnie by maliciously

inducing or persuading the NYAG to prosecute Mr. McBurnie without probable cause. Marsh's

instigation, cooperation and collusion with the New York Attorney General's investigation

included, *inter alia*, 1) financing and conducting most of the investigation internally, then

disclosing the results of their investigation, including privileged materials, to  the New York

Attorney General's office; 2) helping to identify and select the targets of the undercover

investigation; and 3) examining files and records in a conclusory, premeditated fashion in order

to provide inculpatory  evidence.

112.    Marsh induced and/or persuaded the NYAG to prosecute Mr. McBurnie even

though it knew, or reasonably should have known, that he had not committed a crime.

113.    The NYAG would not have sought the indictment of Mr. McBurnie without being

convinced and urged to do so by Marsh, who was trying to protect itself from criminal

prosecution, as well to protect designated senior employees.

114.    The testimony and documents provided to the grand jury were insufficient for a

finding of probable cause to indict Mr. McBurnie.

115.    Some of the testimony provided to the grand jury was later even recanted.

116.    The prosecution and indictment have been dismissed in Mr. McBurnie's favor.

117.   Marsh at all relevant times knew that the charges lacked merit or recklessly disregarded the truth for their own gain.

118.   Marsh colluded with and convinced the New York Attorney General, for improper motives and without a good faith basis, to prosecute Mr. McBurnie.  Among other reasons, the Marsh Defendants improperly sought to avoid criminal prosecution against themselves, to create public scapegoats for the New York Attorney General's allegations, to protect certain senior employees, including but not limited to Chris Treanor and Roger Egan, and by means of all of the foregoing, to improve Marsh's position in the civil litigations related to the business practices that were the subject of the NYAG's investigation of Marsh.  Further, Mr. Cherkasky sought to gain, and did gain, a large economic benefit by becoming CEO of Marsh and receiving a lucrative employment contract through collusion with Spitzer.

119.   Due to malicious prosecution by Defendants, Mr. McBurnie suffered damages including lost compensation, substantial penalties and fees for early withdrawals from his retirement plan, interest costs on hundreds of thousands of dollars of debt he incurred to support himself and his family during his long period of unemployment, damage to his reputation, emotional distress, and loss of time and severe inconvenience in defending the McBurnie Indictment.  In addition, Defendants are liable for punitive damages due to Defendants' egregious and intentional conduct.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

## COUNT III
(Against All Defendants)
### (BREACH OF CONTRACT WITH RESPECT TO THE MARSH BY-LAWS AND UNDERTAKING FOR ADVANCEMENT OF EXPENSES)

120.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 119 above as specifically set forth herein.

121.    As an employee of Marsh, Mr. McBurnie was entitled to the benefits set forth in The Marsh By-Laws.

122.    The Marsh By-Laws guaranteed that Mr. McBurnie's defense costs would be paid in connection with any of his conduct in the course of doing business for Marsh.

123.    Thus, the Marsh By-Laws constituted a contract between Mr. McBurnie and Marsh.

124.    In addition, the Undertaking for Advancement of Expenses that Mr. McBurnie was required to sign in October 2004 reiterated and reaffirmed the same commitment made in the Marsh By-Laws.

125.    Mr. McBurnie fully performed his obligations under the Marsh By-Laws by working for Marsh.

126.    By failing to timely pay Mr. McBurnie's legal fees, Marsh breached the plain language of the contract.

127.    As a result of Marsh's actions and failure to perform its obligations, Mr. McBurnie has suffered damages, including, but not limited to, penalties for early withdrawal of his retirement account, interest on debt he was forced to incur to front the money, plus pre and post judgment interest.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

**COUNT IV**
(Against all Defendants)

(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

128.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 127  above as if specifically set forth herein.

129.   As an employee of Marsh, Mr. McBurnie was entitled to the benefits set forth in The Marsh By-Laws.

130.   The Marsh By-Laws guaranteed that Mr. McBurnie's defense costs would be paid in connection with any of his conduct in the course of doing business for Marsh.

131.   Thus, the Marsh By-Laws constituted a contract between Mr. McBurnie and Marsh.

132.   Mr. McBurnie fully performed his obligations under the Marsh By-laws by working for Marsh.

133.   By failing to timely pay Mr. McBurnie's legal fees, Marsh breached the implied covenant of good faith and fair dealing in the contract.

134.   As a result of Marsh's actions and breach of the implied covenant of good faith and fair dealing, Mr. McBurnie has suffered damages, including, but not limited to, penalties for early withdrawal of his retirement account, interest on debt he was forced to incur to front the money, plus pre and post judgment interest.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

### COUNT V
(Against all Defendants)
(BREACH OF CONTRACT WITH RESPECT TO THE D&O POLICY)

135.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 134 above as specifically set forth herein.

136.    Marsh was the broker for and named insured under the D&O policies pursuant to which Mr. McBurnie's defense costs should have been covered.

137.    Mr. McBurnie, as an officer of Marsh, was an insured under Marsh's D&O policies.

138.    Mr. McBurnie requested from Marsh, the broker for the D&O policies, information regarding his rights under the D&O policies and requested copies of the D&O policies in connection with the defense costs he was incurring related to his employment with Marsh.

139.    Marsh refused to supply Mr. McBurnie with a copy of the D&O policies and/or to even provide him with the names of the insurance carriers for the policies under which he was entitled to coverage as an insured.

140.    In so doing, Marsh violated NJAC 1:2-17.5(b) which requires that no broker "shall conceal from first party claimants benefits, coverages or other provisions of any insurance policy or insurance contract when such benefits, coverages or other provisions are pertinent to a claim."

141.    Marsh breached its duty as a broker to Mr. McBurnie, an insured under the D&O policies.

142.    As a result of Marsh's actions and failure to perform its obligations, Mr. McBurnie has suffered damages, including, but not limited to, penalties for early withdrawal of his retirement account, interest on debt he was forced to incur to front the money, plus pre and post judgment interest.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

### COUNT VI
(Against all Defendants)
(UNJUST ENRICHMENT)

143.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 142 above as if specifically set forth herein.

144.    Marsh is liable to Mr. McBurnie under the theory of unjust enrichment.

145.    Mr. McBurnie bestowed a benefit on Marsh by working for Marsh.

146.    Marsh obtained this benefit without adequately providing the promised defense coverage and protecting Mr. McBurnie through the timely payment of legal fees.

147.    Marsh received further benefit through using the aggregate amounts of the D&O policies for other matters.

148.    By not timely paying Mr. McBurnie's defense costs, Marsh was able to reach certain targets and receive additional bonuses.

149.    As a result of Marsh's actions and failure to perform its obligations, Mr. McBurnie has suffered damages, including, but not limited to, penalties for early withdrawal of

his retirement account, interest on debt he was forced to incur to front the money, plus pre and post judgment interest, costs and attorney's fees.

150.    The circumstances are such that equity and good conscience require Marsh to make restitution to Mr. McBurnie.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

### **COUNT VII**
(Against all Defendants)
(QUANTUM MERUIT)

151.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 150 above as if specifically set forth herein.

152.    Marsh is liable to Mr. McBurnie under the theory of quantum meruit.

153.    Mr. McBurnie, as an employee of Marsh, performed services in good faith.

154.    Marsh accepted services from Mr. McBurnie.

155.    As Marsh was aware, Mr. McBurnie expected to be defended and indemnified by Marsh for his conduct while employed.

156.    Marsh owed Mr. McBurnie timely payment of his defense fees, but failed to provide them, causing Mr. McBurnie, who was then unemployable in the insurance industry due to the baseless criminal charges, to have been expend his own monies to pay his defense fees and to incur debt and interest on debt.

157.    Given the circumstances, to deny Mr. McBurnie recovery would be unjust.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

**COUNT VIII**
(Against all Defendants)
(TORTIOUS INTERFERENCE WITH CONTRACT)

158.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 157 above as if specifically set forth herein.

159.    Mr. McBurnie, as an officer of Marsh, was an insured under the Marsh D&O policies.

160.    Mr. McBurnie requested from Marsh, the named insured of the D&O policies, information regarding his rights under the D&O policies as an insured and requested copies of the D&O policies in connection with the defense costs he was incurring related to his employment with Marsh.  Marsh refused to supply this information.

161.    Because Marsh refused to supply copies of the Marsh D&O policies or information regarding the policies, Mr. McBurnie cannot identify with certainty which entities were the insurance carriers for the policies.

162.    Marsh tortiously interfered with Mr. McBurnie's contract as an insured under the Marsh D&O policies with the insurance carriers in an effort to deprive Mr. McBurnie of the benefits under that policy and to retain the aggregate limits of the policy for its own use and for use of other favored employees.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

## COUNT IX
### (Against all Defendants)
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT)

163.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 162 above as if specifically set forth herein.

164.   After his termination from Marsh in February 2005, Mr. McBurnie sought new employment within the insurance industry.

165.   He was in the process of securing employment with Integro.

166.   On September 15, 2005, the McBurnie Indictment was issued as a result of Marsh's intentional conduct.

167.   All discussions with Integro promptly ceased.

168.   The McBurnie Indictment was issued as a result of Marsh's intentional conduct in targeting Mr. McBurnie to the NYAG for prosecution without justification or excuse.

169.   Marsh tortiously interfered with Mr. McBurnie's prospective contract with Integro.

WHEREFORE, Plaintiff William L. McBurnie demands judgment in his favor and against All Defendants for a sum in excess of $150,000 in compensatory and punitive damages together with lawful interests and costs and any other relief the Court deems just an appropriate.

Respectfully submitted,

**HAINES & ASSOCIATES**

BY:   <u>/s/Danielle M. Weiss</u>
        Validation Signature Code:  dw2372
        1835 Market Street, Suite 2420
        Philadelphia, PA  19103
        Tel: (215) 246-2200
        Fax:  (215) 346-2211
        Email: dweiss@haines-law.com
        *Attorneys for Plaintiff*

Date:  December 2, 2011

*Of Counsel:*
Clifford E. Haines
Patrick C. Campbell, Jr.
Hollie B. Knox

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues.

Respectfully submitted,

**HAINES & ASSOCIATES**

BY:   <u>/s/Danielle M. Weiss</u>
        Validation Signature Code:  dw2372
        1835 Market Street, Suite 2420
        Philadelphia, PA  19103
        Tel: (215) 246-2200
        Fax:  (215) 346-2211
        Email: dweiss@haines-law.com

        *Attorneys for Plaintiff*

Date:  December 2, 2011

*Of Counsel:*
Clifford E. Haines
Patrick C. Campbell, Jr.
Hollie B. Knox

33